UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:17-cv-20264-SCOLA/OTAZO-REYES

CAPTEN TRADING LTD.,

      Plaintiff,

v.

BANCO SANTANDER INTERNATIONAL,

      Defendant.

_____/

**DEFENDANT BANCO SANTANDER INTERNATIONAL'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

      Defendant, Banco Santander International (the "Bank" or "BSI"), pursuant to Federal Rule of Civil Procedure 56 and Southern District of Florida Local Rule 56.1(a), files this motion for summary judgment against Plaintiff, Capten Trading LTD ("Capten"), and, in support, states as follows:

**I.   INTRODUCTION**

      In this action, Plaintiff seeks to shift to BSI responsibility for a third party "hacker" purportedly gaining access to Plaintiff's authorized agent's electronic mail system and sending to BSI allegedly unauthorized wire transfer instructions, which correctly incorporated all of the security procedures agreed to by Plaintiff and BSI. Plaintiff's claims fail as a matter of law.

      Plaintiff, as a BSI deposit customer, claims that certain wire transfers, which (a) were ordered in emails sent from the email account of Plaintiff's agent, Roberto Bienenwald ("Bienenwald"), to BSI, (b) contained Plaintiff's personal identification number ("PIN"), and (c) were accepted by the Bank pursuant to and in compliance with the parties' agreed-upon security

procedure and written agreement, were not authorized because the emails allegedly were sent by a third-party hacker (that may have hacked into Bienenwald's email account and/or computer). Describing these events in its Complaint, Plaintiff loosely uses the word "third party hacker" [DE-1, ¶¶ 34, 35, 42], and Plaintiff alleges that "[i]t appears that what might have permitted these [allegedly] unauthorized wires was the hacking of Mr. Bienenwald's (your customer) computer, but that does not excuse the [B]ank." [DE-1-1]. Notwithstanding its allegations regarding the cause of its alleged losses, Plaintiff purports to allege claims against BSI for breach of contract, negligence, and breach of fiduciary duty.

BSI is entitled to summary judgment, because as a matter of law, Plaintiff's claims are displaced by the Uniform Commercial Code (the "UCC"). In addition, it is undisputed that BSI complied with the parties' contractually agreed security procedure. Also, the terms of the parties' contract bar Plaintiff's claims, and, its purported claim for "special damages" is barred by both its failure to plead special damages with the requisite level of specificity and the terms of the parties' contract. Finally, the independent tort doctrine bars Plaintiff's tort claims.

## II. STATEMENT OF UNDISPUTED FACTS[1]

1. On or about September 6, 2013, Bienenwald opened a standard bank account (the "Account") with BSI in the name of Capten Trading, LTD. [DE-1, ¶ 5; DE-15 ¶ 5; DE-16-1 Sec. 5]. Prado Dec. at ¶ 4.

2. Bienenwald is an Argentine citizen residing in Argentina. [DE-17 p. 2].

3. The authorized signatories on the Account were Bienenwald, Matias Bienenwald and Jorge Bienenwald. [DE-16-1 p. 8; Prado Dec. at ¶ 5].

---

[1] Attached to this Motion as Exhibit A is the Declaration of Marco Prado, which shall be referred to as the "Prado Dec."

4. The email address registered with BSI, as the official email address of Capten, was scrap3232@yahoo.com.ar ("Capten's Argentine Email Account"). [DE-11-3, ¶8; Prado Dec. at ¶ 6].

5. Upon opening the Account, BSI and Capten entered into a binding contract (the "Contract"), attached as Exhibit 1. [DE-1 ¶ 6; Prado Dec. at ¶ 5].

6. The entirety of the Parties' contractual agreement is encompassed in the Account Agreement together with the Terms & Conditions Governing Accounts ("Terms & Conditions"). [DE-16-1 initial paragraph; DE-14-3 Sec. 79; Prado Dec. at ¶ 5].

7. All three authorized signatories signed the Account Agreement. [DE-16-1 p. 8].

8. As part of the Account Agreement, Capten selected, and the parties agreed upon, a security procedure that would be used to initiate funds transfers. BSI offered three commonly used alternative processes as security procedures for the Capten's wire transfer requests directed to the Bank:[2]

 A. <u>Instructions Verified Through Telephone Callback</u>. With this simple alternative, an authorized signatory of an account sends a wire transfer request to the Bank (specifying amount, beneficiary, beneficiary's bank, and certain other information) which then confirms the details of the request by initiating a telephone call (at a previously agreed-upon number) to the authorized signatory requesting the wire.

 B. <u>Variable Code (With PIN)</u>. This alternative involves the Bank providing the authorized signer of wire requests with a unique system-generated personal identification

---

[2] The three alternative security procedures are further described in the Bank's Terms and Conditions ¶ 48. The means for delivering a wire transfer request to the Bank are variously described in the Account Agreement and the Terms and Conditions as original writing, facsimile, electronic copy of written originals, telephone, telex, fax and written originals. Terms and Conditions ¶ 48 and Account Agreement ¶¶ 6 and 8. Capten agreed to be bound by the Terms and Conditions in the initial paragraph of the Account Agreement.

3

number (PIN) and a so-called Code Card that provides different numerical values for day-of-the-week, month and date-of-the-month corresponding with the date when the wire request is made. By adding the PIN to the values generated using the Code Card, a Transaction Code Number is generated by the sender and included in the wire transfer request to the Bank which mathematically verifies the legitimacy of the Transaction Code Number before sending the wire. No telephone callback for confirmation purposes is part of this alternative.

        C.      <u>Test Key</u>. This alternative is similar to "B" above except that the Code Card has several more variables. In addition to the PIN and date-related variables used to calculate a Transaction Code Number as described in the preceding paragraph, the Code Card for "C" includes variables for the currency and amount of the wire, and a prefix number related to the order in which the wire was sent to the Bank relative to other wires the customer may have sent on the same day. The customer calculates the Transaction Code Number, including the value associated with the PIN, and sends it with the wire transfer request to the Bank. Upon receipt of the request, the Bank performs its own calculation of the Transaction Code Number before sending the wire in order to assure that the Transaction Code Number is legitimate. Like "B", no telephone callback for confirmation purposes is part of this alternative. [Prado Dec. at ¶¶ 7 - 10].

        9.      Alternatives "B" and "C" are considered to be "multi-factor" authentication procedures in that both involve use of a unique PIN to be used solely for wire transfers plus a Code Card to be used in making the required calculations noted above. [Prado Dec. at ¶ 11].

        10.     Capten selected the second security alternative (Variable Code (with PIN)) whereby the Bank provided Bienenwald with a wire transfer PIN and a Code Card. Account Agreement Sec. 7. The Bank's Terms and Conditions, which Capten agreed to by executing the

4

Account Agreement, state that by selecting this second alternative "[y]ou [Capten] acknowledge and understand that although similar to a test key [alternative #3], the use of a variable code with PIN-Code [alternative #2] is not as secure as the use of a test key".[3] [Prado Dec. at ¶ 12].

11.   Capten named Bienenwald as the authorized signatory to whom the variable code (with PIN) would be delivered. [DE-16-1 Sec. 7].

12.   On September 13, 2013, BSI provided Capten with correspondence stating "[w]e would remind you that you are entirely responsible for keeping your personal identification number confidential as well as the code card and your instructions for handling it confidential and in a safe place." [Certified translation of Capten000060; Prado Dec. at ¶13].

13.   That same day, BSI provided Capten with a separate letter, with Capten's personal identification number. [Certified translation of Capten000061; Prado Dec. at 14].

14.   Later that month, Capten provided BSI with a signed letter, dated September 23, 2013, stating the following: "With reference to the correspondence forwarded by the Bank on September 13, 2013, I certify that I have received the 'Code Card' and the 'Letter with the Personal Identification Number.' I also state that I agree to the terms and conditions contained in the 'Authorization and Agreement for Fund Transfer.'" [Certified translation of Capten000060; Prado Dec. at ¶ 15].

15.   Capten used the Account to, among other things, send wire transfers to parties in the U.S. and internationally. [DE-1, ¶7; Prado Dec. at ¶ 16].

16.   In the two years from when the Account was opened until September 2015, using the PIN and accepted security procedure, Capten initiated over 200 wire transfers, averaging

---

[3] Terms and Conditions, ¶ 48.

about nine wire transfers per month with an average value of approximately $36,644. [DE-11-3, ¶9; Prado Dec. at ¶ 16].

17.     On July 27, 2015, BSI received an e-mail originating from Capten's electronic mail account and incorporating the agreed upon security procedure and pin number directing a wire transfer in the amount of $47,670 to TTYG Investment. In accordance with Capten's direction, those funds were transferred from the Account. [Prado Dec. at ¶ 20].

18.     On July 28, 2015, BSI received an e-mail originating from Capten's electronic mail account and incorporating the agreed upon security procedure and pin number directing a wire transfer in the amount of $48,390.00 to M. SAMP Enterprises. In accordance with Capten's direction, those funds were transferred from the Account. [Prado Dec. at ¶ 21].

19.     On September 3, 2015, BSI received an e-mail originating from Capten's electronic mail account and incorporating the agreed upon security procedure and pin number directing a wire transfer in the amount of $95,380.00 to Mackymola Inc. In accordance with Capten's direction, those funds were transferred from the Account. [Prado Dec. at ¶ 22].

20.     On September 3, 2015, BSI received an e-mail originating from Capten's electronic mail account and incorporating the agreed upon security procedure and pin number directing a wire transfer in the amount of $94,980.00 to AZZ Auto Center, Inc. In accordance with Capten's direction, those funds were transferred from the Account. [Prado Dec. at ¶ 23].

21.     On September 10, 2015, BSI received an e-mail originating from Capten's electronic mail account and incorporating the agreed upon security procedure and pin number directing a wire transfer in the amount of $96,780.00 to Green Ventures. In accordance with Capten's direction, BSI initiated the transfer of those funds from the Account. [Prado Dec. at ¶ 24].

22. The transfer to Green Ventures was not completed, because the Green Ventures account had been closed. As a result, the funds were returned to Capten's Account. [Prado Dec. at ¶ 25].

23. Plaintiff asserts that six wires initiated in 2015 were unauthorized and fraudulent (the "Allegedly Illegitimate Transfers"):

   i. $47,670.00 transfer on July 27, 2015 to TTYG INVESTMENT at Santander Bank, N.A.

   ii. $48,390.00 transfer on July 28, 2015 to M.SAMP ENTERPRISES at CitiBank.

   iii. $94,980.00 transfer on September 3, 2015 to A2Z AUTO CENTER INC at Bank of America.

   iv. $95,380.00 transfer on September 3, 2015 to MACKYMOLA INC at BB&T Bank.

   v. $50,000.00 transfer on September 10, 2015 to GREEN VENTURES INTERNATIONAL, LLC in Hong Kong.

   vi. $52,000.00 transfer on September 10, 2015 to GREEN VENTURES INTERNATIONAL, LLC in Hong Kong.[4]

24. BSI was able to recover a substantial portion of the Allegedly Illegitimate Transfers on behalf of Capten from the beneficiaries' banks. [Prado Dec. at ¶ 26]

25. Each of the transfers about which Plaintiff complains was accomplished in a manner consistent with the Account Agreement and Terms and Conditions using the established PINs and Codes. BSI accepted and acted on the related transfer instructions in compliance with the security procedure chosen by Capten and in compliance with the written agreement between BSI and Capten. [Prado Dec. at ¶ 27].

---

[4] Complaint, ¶¶ 15-20. Plaintiff's allegation regarding the number and amounts of attempted transfers to Green Ventures International, LLC on September 10, 2015 are incorrect.

7

26. But for the wire instructions received from Capten's email account, where all subject transactions originated, the transfers about which Plaintiff complains would not have taken place. [Prado Dec. at ¶ 28].

### III. MEMORANDUM OF LAW

#### A. The Relevant Legal Standard:

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal citations omitted). Summary judgment must be granted if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In order to avoid summary judgment, "the non-moving party must make a sufficient showing on *each* essential element of the case for which he has the burden of proof." *Anderson v. Branch Banking & Trust Co.*, 119 F. Supp. 3d 1328, 1356 (S.D. Fla. 2015) (emphasis added) (internal citations omitted). The non-moving party must "advance specific, *supported facts* which would suggest that a reasonable factfinder could find in the non-movant's favor." *Id.* (emphasis added). Here, Capten has no evidence to support its claims. To the contrary, the evidence and applicable law conclusively demonstrate that summary judgment should be entered in BSI's favor.

#### B. The Uniform Commercial Code And The Florida Uniform Commercial Code Displace Plaintiff's Claims.

Plaintiff's claims are displaced by UCC Article 4A and its Florida counterparts, e.g., Sections 670.202 and 670.203 of the Florida Statutes.[5] Florida Statutes Chapter 670, provides a comprehensive and exclusive framework for the allocation of risk, as between a bank and its

---

[5] *See* Section 671.101, Florida Statutes, stating that "Chapters 670-680 may be cited as the Uniform Commercial Code."

8

customer, arising from wire transfer transactions. As a matter of law, Chapter 670 assigns liability between the parties and displaces all of Plaintiff's claims.[6]

"Where the rights, duties, and liabilities of the parties are governed by the U.C.C., the Code displaces common law claims." *Branch Banking & Trust Co.*, 119 F. Supp. 3d at 1356 (also stating that "where plaintiff's claim is inconsistent with the rights, duties, and liabilities contained within the Article, *the plaintiff may not sidestep those obligations and pursue her claim under the common law*") (emphasis added); *see also* Fla. Stat. § 671.103 (common law principles supplement the Code "[u]nless displaced by the particular provisions of th[e C]ode"). Further, under the UCC, "[t]he concept of 'displacement' allows the Code to abrogate common law rules without requiring unequivocal, explicit reference to the common law in each statutory section that effects a modification." *See Burtman v. Tech. Chemicals & Products, Inc.*, 724 So. 2d 672, 676 (Fla. 4th DCA 1999).[7]

Notably, *any negligence theory premised solely on allegedly unauthorized bank transfers is displaced by Articles 4 and 4A* "as the claims fall precisely within the duty contemplated by the statutory scheme under the aforementioned Articles." *Branch Banking & Trust Co.*, 119 F. Supp. 3d at 1357. Thus, "'[a]ny common law claims about the existence of unauthorized wire transfers…and the mechanics of how those transactions were conducted, fall within the regime

---

[6] The Official Comments to Section 670.102 of the Florida Statutes provide: "[i]n the drafting of Article 4A, a deliberate decision was made . . . to use precise and detailed rules to assign responsibility . . . and **establish limits on liability**, rather than to rely on broadly stated, flexible principles. . . . [A] critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately." (emphasis added).

[7] *See also Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 90 (2d Cir. 2010) (finding that "[t]he fact that Article 4A does not expressly refer to common law claims such as fraud or breach of fiduciary duty is not dispositive. Article 4A's text strongly suggests that it applies to claims asserting the existence of unauthorized wire transfers regardless of what the claims may be called.").

9

of Articles 4-A and 4.'" *Id.* citing to *2006 Frank Calandra, Jr. Irrevocable Tr. v. Signature Bank Corp.*, 816 F. Supp. 2d 222, 236 (S.D.N.Y. 2011), *aff'd*, 503 Fed. Appx. 51 (2d Cir. 2012); *see also Ma*, 597 F.3d at 90 (holding that plaintiff's claims for *breach of contract*, *breach of fiduciary duty*, fraud, conversion, *negligence*, and breach of the covenant of good faith and fair dealing were displaced by UCC Article 4A because, like in the present case, all of plaintiff's claims were based on the premise "that the funds transfer were altogether unauthorized") (emphasis added to claims which are asserted in the present case).

Here, Plaintiff's three claims against BSI—Breach of Contract (Count I), Negligence (Count II) and Breach of Fiduciary Duty (Count III)—are all common law claims based exclusively on Plaintiff's allegations that "a total of $190,000.00 was transferred out of Plaintiff's account without its knowledge, consent or authorization." [DE-1, ¶ 22]. This is evident by Plaintiff's response to BSI's First Set of Interrogatories, Interrogatory No. 14, asking Plaintiff "[i]f you denied any of the Requests …for Admissions… explain why." [DE-33-1]. Plaintiff answered, with respect to denying that the subject wire transfers were sent from its email to BSI, "**all** that I know at this time is that I never effectuated nor directed the transmission of those emails." [DE-33-1] (Emphasis added). Consequently, because all of Plaintiff's common law claims are premised "at their core, [on] assertions that [it] did not order or approve any of the disputed electronic funds transfers from [its] account," Plaintiff's common law claims are displaced by the UCC and summary judgment is proper. *See Ma*, 597 F.3d at 90.

As a matter law, the UCC displaces all of Capten's common law claims, and the Court should enter summary judgment in BSI's favor.

### C. Even Assuming no UCC Displacement, BSI is still Entitled to Summary Judgment.

Assuming, *arguendo*, that this Court finds Plaintiff's claims are not displaced by the UCC, this Court should nevertheless grant summary judgment, because the claims Capten purports to allege are barred by the parties' Contract and are contrary to the undisputed facts.

As the Court previously has recognized, "'[Capten] must bear the consequences of [its] bargain.'" [DE-39 *citing to Hamilton v. Sheridan Healthcorp, Inc.*, No. 13-62008-CIV, 2014 WL 537343, at *3 (S.D. Fla. Feb. 11, 2014). [DE-39]. Moreover, "it is well settled that 'when the terms of a voluntary contract are clear and unambiguous, ... the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties.'" *See Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290-91 (11th Cir. 2001) *citing to Emergency Assocs. of Tampa, P.A. v. Sassano*, 664 So.2d 1000, 1003 (Fla. 2d DCA 1995).

#### i. The Contract Bars Plaintiff's Claims.

The undisputed evidence demonstrates that Capten chose the Variable Code (with PIN) security procedure *despite* having two other options to choose from and being advised that "the use of a variable code (with Pin-Code) is not as secure as the use of a test key." [DE-16-1 Sec. 7; DE-14-3, Terms and Conditions Sec. 48(D); Prado Dec. at ¶ 12]. Capten also agreed as follows regarding security procedures:

> Bank uses the Security Procedure to increase the possibility that Bank will detect a Request that is not genuine before executing the Request. You hereby agree to be bound by any Request, **whether or not genuine or authorized**, if the Request purports to be issued on your behalf and is accepted by Bank in compliance with the Security Procedure.

Terms and Conditions § 49(A) (Emphasis added).

Moreover, the allegedly unauthorized wire transfer instructions were received by the bank from an electronic mail address *registered with BSI as the official email address of Capten.* [Prado Dec. at 6]. And, the allegedly unauthorized wire transfer instructions incorporated the agreed-upon security procedure and PIN. [DE-11-3, ¶¶ 10-14; Prado Dec. at ¶¶ 20-24, 27]. BSI accepted and acted upon the wire transfer instructions from Capten in compliance with the Variable Code (with PIN) procedure selected by Capten and the parties' written agreement. [Prado Dec. at ¶ 27].

Section 68(A) of the Terms and Conditions also bars Plaintiff's claims and imposes on Plaintiff a duty to indemnify and hold BSI harmless "from any and all claims…costs or disbursements of any kind or nature whatsoever, by whomever brought or caused…in any way relating to or arising out of… (v) Bank's execution of any funds transfer payment order in accordance with its terms." Pursuant to Sections 49(A) and 68(A) of the Terms and Conditions, Capten is bound by its wire transfer instructions, and summary judgment should be entered in BSI's favor.

Capten is also barred from bringing any claims against BSI because Capten did not timely notify BSI of the allegedly unauthorized transfers as required by the Terms and Conditions. Section 62 of the Terms and Conditions states:

> Because you are in the best position to detect error, problems and discrepancies of Account, unauthorized signatures, endorsements or alterations of items, and without limiting the generality of Section 68, **you are fully precluded from asserting any dispute or difference as to a statement and from asserting, prosecuting or enforcing any claim or cause of action against Bank for any payment…** or <u>transfer</u> described in a statement or evidenced by any of the accompanying items or documentation if: (A) **you fail to promptly deliver written notice to Bank of any alleged problem, or error within twenty (20) calendar days after the statement, items or documentation has been mailed to you or made available to you…** you are also precluded from asserting, prosecuting or enforcing any claim or cause of action against Bank for any unauthorized signatures or alterations **by the same wrongdoer** on items paid by

>  Bank after the time period mentioned above lapsed, but before Bank receives notice.

(Emphasis added).

Capten asserts that it "would check [its] account online." [DE-33-1, ¶ 8]. Capten also asserts that the allegedly unauthorized transfer instructions were sent by a third-party hacker. [DE-1, ¶34, 35]. The first allegedly unauthorized transaction occurred on July 27, 2015. [DE-1, ¶16]. Capten, however, did not notify the Bank until September 10, 2015, more than twenty days after the e-mail allegedly had been compromised. The remaining allegedly unauthorized transactions also occurred before Capten notified BSI of the original allegedly unauthorized transfer. As a result, the Contract bars Capten from bringing "any claim or cause of action against Bank," and summary judgment should be entered in BSI's favor.

> ii. *The Breach of Contract Claim*

"To prevail on a claim for breach of contract under Florida law, the plaintiff must prove (1) a valid contract; (2) a material breach; and (3) damages." *Risk v. Maclachlan*, 2016 WL 777091, at *4 (S.D. Fla. Feb. 29 2016). Plaintiff alleges that BSI had a contractual duty to ensure that "wires transmitting funds from the Plaintiff's deposit monies be properly authorized by the Plaintiff" and that BSI breached that duty by allegedly failing to "detect fraudulent wire transfer orders against funds in the Plaintiff's account." Compl. ¶¶ 30, 31. BSI is entitled to summary judgment on this claim, because the undisputed evidence, more fully discussed above, establishes that BSI complied with the parties' contractually agreed security procedure and was entitled to act in accord with the wire transfer instructions it received.[8]

---

[8] The same argument applies with respect to Plaintiff's claims that BSI breached the Contract by not catching that the "payees were not to developers or construction companies; and not paying close enough attention to notice that the signatures were cut and paste." [DE-33-1, ¶6].

13

Plaintiff also asserts in a discovery response that BSI breached the Contract because "the bank did not call Capten in advance of authorizing and effectuating the wire transfers at issue to verify that they were legitimate." [DE-33-1, ¶6]. However, BSI did not have a duty to call Capten to verify the transfers' legitimacy because the security procedure contractually chosen by Capten was followed, and it did not require a verification call. At the time of entering into the Account Agreement, Capten could have chosen a security procedure requiring a verification call, but it did not do so. [16-1, Sec. 7]. Capten cannot now rest its theory of breach of contract on the claim that BSI did not follow a security procedure that Capten rejected and was not part of the parties' agreement.

Based upon the foregoing, the Court should enter summary judgment in BSI's favor on Plaintiff's breach of contract claim.

### iii. The Negligence Claim

In its negligence count, Plaintiff alleges that BSI "owed a duty to the Plaintiff to conform to a certain standard of conduct to protect the Plaintiffs' funds from unreasonable risk and unlawful activity that might result in the ability of a third party hacker to unlawfully remove funds from Plaintiff's account." Compl. ¶ 34. Plaintiff alleges that BSI breached its duty by not having "sufficient security controls and measures to prevent a third party hacker from accessing. . . [Plaintiff's account] to conduct unauthorized wire transfers." Compl. ¶ 35.

Despite Plaintiff's amorphous duty allegation, the fact is that BSI owed Plaintiff the contractual duty to follow the security procedure that Plaintiff chose and to act in accord with wire transfer instructions that complied with that procedure. The undisputed evidence establishes that BSI satisfied that duty. Moreover, contrary to Plaintiff's innuendo, there is no evidence that a third party hacker accessed BSI's computer systems to conduct unauthorized

14

wire transfers from Plaintiff's account. Rather, the wire transfer instructions were received from Plaintiff's authorized electronic mail account in accordance with the agreed upon security procedure, and every indication is that Plaintiff's electronic mail system was hacked. *See* Compl. Ex. C ("It appears that what might have permitted these unauthorized wires was the hacking of Mr. Bienenwald's (your customer) computer . . ..").

### iv. The Breach Of Fiduciary Duty Claim

"A claim for breach of fiduciary duty requires '(1) the existence of a fiduciary duty, (2) breach of that duty, and (3) damages flowing from the breach.'" *See Christie v. Bank of Am., N.A.*, 813-CV-1371-T-23TBM, 2014 WL 5285987, at *3 (M.D. Fla. Oct. 15, 2014) (internal citations omitted).

As is set forth above, BSI owed Plaintiff the contractual duty to follow the security procedure that Plaintiff chose and to act in accord with wire transfer instructions that complied with that procedure. The undisputed evidence establishes that BSI satisfied that duty.

As a matter of law, BSI did not owe Plaintiff any fiduciary duties relating to the wire transfer instructions at issue. A bank and its depositors have the relationship of debtor and creditor to each other, with the depositor being a creditor and the bank being a debtor. *See Abel & Buchiem, P.R., Inc. v. Citibank,* NA, 2017 WL 3731002, at *3 (S. D. Fla. August 28, 2017); *Regions Bank v. Kaplan*, 2013 WL 1193831, at *23 (M.D. Fla. March 22, 2013). A bank does not have a fiduciary relationship with its standard deposit account customers. *Id.; Arbitrajes Financieros, S.A. v. Bank of Am., N.A.*, 605 Fed. Appx. 820, 823 (11th Cir. 2015)

Plaintiff's account was a standard deposit account. [Account Agreement Sec. 5]. The relationship between BSI and Plaintiff was nothing more than an ordinary bank/customer or

creditor/debtor relationship to which no fiduciary duties attach. As a result and as a matter of law, there was no breach of fiduciary duty in this context.

In addition, even if BSI owed Plaintiff any fiduciary duties, there is no evidence to support Plaintiff's allegations of breach of duty. Plaintiff alleges that BSI

> breached its fiduciary duty by failing to adequately protect the Plaintiff's deposits at the bank in that its firewalls and other IT protections were not sufficient to prevent a third party hacker from electronically accessing the Plaintiff's bank account and removing money therefrom in the form of outgoing wire transfers from the account.

Compl. ¶ 42.

As is set forth above, there is no evidence that a third party hacker accessed BSI's computer systems to remove money from Plaintiff's account in the form of unauthorized wire transfers. Rather, the wire transfer instructions were received from Plaintiff's authorized electronic mail account in accordance with the agreed upon security procedure, and every indication is that Plaintiff's electronic mail system was hacked. *See* Compl. Ex. C.

Based upon the foregoing, the Court should enter summary judgment in BSI's favor on Plaintiff's breach of fiduciary duty claim.

**D.    The Independent Tort Doctrine Bars Plaintiff's Negligence and Breach of Fiduciary Duty Claims.**

The independent tort doctrine "bars a tort claim where a defendant has not committed a breach of duty independent of his breach of contract." *Tulepan v. Roberts*, 14-CV-80574, 2015 WL 235441, at *6 (S.D. Fla. Jan. 16, 2015); *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 408-09 (Fla. 2013) (Pariente, J., concurring).

In analyzing Florida's independent tort doctrine, the Southern District of Florida clarified that fundamental contract principles were not upset by the Florida Supreme Court's decision in the *Tiara* case. *See Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1318 (S.D. Fla. 2014)

16

(interpreting *Tiara*, 110 So. 3d at 407, 408, 410 n.10). Indeed, in a concurring opinion in *Tiara*, Florida Supreme Court Justice Pariente explained that the holding in *Tiara* did nothing to change well-settled contract law. *Tiara*, 110 So. 3d at 408-09 (Pariente, J., concurring). To the contrary, the decision in *Tiara* merely explained that common law principles of contract—not the economic loss doctrine—precluded a tort claim that was not independent of a breach of contract claim. *Id.* at 409 (Pariente, J., concurring). To be sure, "to bring a valid tort claim, a party still must demonstrate that all of the required elements for the cause of action are satisfied, including that the tort is independent of any breach of contract claim." *Id.* at 408 (citing *Lewis v. Guthartz*, 428 So. 2d 222, 224 (Fla. 1982)); *see also Lookout Mountain Wild Animal Park, Inc. v. Stearns Zoological Rescue & Rehab Ctr., Inc.*, 553 Fed. App'x 864, 865-66 (11th Cir. 2014) (per curiam) (affirming judgment as a matter of law in favor of defendants with respect to plaintiff's tort claims because plaintiff failed to identify any tortious acts sufficiently independent of the alleged breach of contract); *Alhassid*, 60 F. Supp. 3d at 1318 ("Fundamental contractual principles continue to bar a tort claim where the offending party has committed no breach of duty independent of a breach of its contractual obligations.").

Here, Plaintiff's sole basis for its tort claims (negligence and breach of fiduciary duty) is the parties' contractual relationship. As such, the Court should grant summary judgment with respect to both Count II for negligence and Count III for breach of fiduciary.

> E. **Plaintiff Does Not Allege Special Damages With Specificity And The Contract Precludes An Award of Special Damages.**

"To survive summary judgment…Plaintiffs must specifically plead special damages." *See Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268 (S.D. Fla. 2004). In fact, Federal Rule of Civil Procedure 9(g) requires an item of special damages to be "specifically stated." "The special damage rule 'requires the plaintiff to establish pecuniary loss that has been

realized or liquidated …. Special damages are actual, out of pocket losses which must be proven by specific evidence as to the time, cause and amount." *Falic*, 347 F. Supp. 2d at 1268.

Here, Plaintiff did not specifically plead special damages. Moreover, when asked in discovery to explain in detail the special damages sought, Plaintiff refused to do so and instead objected on the grounds of legal conclusion. [DE-33-1, ¶ 12]. Similarly, in its October 12, 2017 "Unverified Better Answers to First Set of Interrogatories" [DE-61-1], interrogatory number 12, Plaintiff's failure to identify its alleged special damages, beyond mere conclusory statements, continued. As a result, summary judgment should be entered in BSI's favor.

Even if Plaintiff had pled special damages, it still would be barred from recovering special damages by the parties' contractual agreement. Section 51(J) of the Terms and Conditions states "Bank is not liable to you for any special, incidental, indirect, or consequential damages resulting from Bank's delayed, erroneous or improper execution of a [funds transfer] Request or of its failure to execute a Request." Section 83 of the Terms and Conditions, previously found enforceable by this Court [DE-39], also contains a waiver of any claim for "consequential, incidental, punitive or special damages." These types of contractual damage limitations and exclusions are enforced under Florida law and in the context of this action. *See Gilbert & Caddy, P.A. v. JP Morgan Chase Bank*, 193 F. Supp. 3d 1294, 1309 (S.D. Fla. 2016) (bank account agreement excluded liability for special, consequential and indirect damages). The Court should enter summary judgment on Plaintiff's purported claim for special damages.

## IV. CONCLUSION

Based on the foregoing, BSI respectfully requests that the Court grant summary judgment in its favor and against Capten, grant BSI an award of attorney's fees and costs pursuant to section 68 (A) of the Terms and Conditions (reserving jurisdiction to determine the amount of

recoverable fees and costs) and award any other and further relief as the Court deems just and proper.

Respectfully submitted,

**GUNSTER, YOAKLEY & STEWART, P.A.**
600 Brickell Avenue, Suite 3500
Miami, Florida 33131
Tel: (305) 376-6000; Fax: (305) 376-6010

By:   */s/ Clinton R. Losego*
      Clinton R. Losego, Esq.
      FBN: 818054
      closego@gunster.com

*Attorneys for Defendant*
*Banco Santander International*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 18, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ *Clinton R. Losego*
Clinton R. Losego

## SERVICE LIST

Richard J. Diaz, Esq.
Richard J. Diaz, P.A.
Attorney for Plaintiff
3127 Ponce de Leon Boulevard
Coral Gables, FL 33134
Tel: 305.444.7181
Fax: 305.444.8178
Email: rick@rjdpa.com

MIA_ACTIVE 4660129.3